**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | § | |
| **COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:06-CV-2136-P** |
| | § | |
| **ABC VIATICALS, INC.,** | § | |
| **C. KEITH LAMONDA,** | § | |
| **and JESSE W. LAMONDA, JR.,** | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the order of reference dated May 7, 2012 (doc. 345), before the Court are defendant C. Keith LaMonda's *Motion to Compel Receiver to Comply with Court's Ordered Compromise and Settlement Agreement,* filed May 2, 2012 (doc. 344), and the related *Motion to Freeze Receivership Assets and Enjoin Further Receivership Expenditures Pending Resolution of C. Keith LaMonda's Motion to Compel Herein*, filed July 31, 2012 (doc. 356); the *Motion for Sanctions Against Receiver Pursuant to Federal Rule of Civil Procedure 11*, filed September 11, 2012 (doc. 366), and the *Motion to Intervene of C. Keith LaMonda*, filed October 19, 2012 (doc. 374). Based on the nature of the relief sought and certain statements in the motion to compel and reply (*see* docs. 344 at 14, 39; 350 at 4, 17),[1] it is properly liberally construed as a motion for an order to have the Receiver show cause why he should not be held in contempt for failing to comply with a court order. Based on the relevant filings and applicable law, all four motions should be **DENIED**.

---

[1] Citations refer to the cm/ecf system page number at the top of each page rather than the page numbers at the bottom of each filing.

# I. BACKGROUND

This dispute arises from an action filed by the Securities and Exchange Commission (SEC) against C. Keith LaMonda (LaMonda) and others on November 17, 2006, alleging they had engaged in a scheme to fraudulently offer and sell securities through their life settlement companies, including defendant ABC Viaticals, Inc. (ABC-V). (*See* doc. 1 at 1-2.) On that date, the Court entered an order appointing Michael J. Quilling as the receiver (Receiver) for ABC-V. (*See* doc. 8.) The order authorized the Receiver to take possession of ABC-V's assets and records, including computers and documents, and to enter any premises to take possession of those assets and records. (*Id.* at 2, 4.) It also required ABC-V's employees to deliver to the Receiver all assets and records in their possession and enjoined them from interfering with the operation of the receivership in any way. (*Id.* at 3-4.) The order authorized the Receiver to hire employees to assist him in collecting, preserving, maintaining and operating the receivership assets and records. (*Id.* at 6.) It also authorized him to collect sums of money due to ABC-V and to institute, defend, compromise or adjust court actions or proceedings to protect or recover receivership assets. (*Id.* at 6-7.)

## A.    Compromise and Settlement Agreement

On July 12, 2007, the parties (through the Receiver) filed an agreed motion to approve the attached unsigned copy of a compromise and settlement agreement (Agreement) between him and LaMonda, Leigh Bradley, Jesse LaMonda, and Berna LaMonda (collectively the LaMondas). (*See* docs. 71, 71-2; 344 at 17.) The Agreement set out the parties' agreements concerning their various rights and obligations, including those related to LaMonda's homestead property in Kissimmee, Florida (Property), and to the payment of a percentage of money recovered from third parties with the LaMondas' assistance. (*See* doc. 71-2; doc. 344 at 49-61.) As to the Property, the Agreement

provided:

> **1. Real Property in Kissimmee, Florida.** The house at 1300 Grandview Boulevard in Kissimmee, Florida ("Kissimmee House") is deemed to be impressed with an equitable constructive trust lien in favor of the Receiver in the amount of $1,425,000.00. The lien shall be deemed to exist as of July 21, 2005. Within ten days of signing this Agreement, the LaMondas shall provide the Receiver with (1) keys, security codes, and any other information needed to access the property and (2) as they are received, copies of all invoices relating to the property, including but not limited to any mortgages, maintenance, insurance, and utilities. So long as the Receiver, in his discretion, deems it proper, he shall pay all expenses relating to the Kissimmee House. So long as the property is maintained to the Receiver's satisfaction, Keith LaMonda and Leigh Bradley may reside in or otherwise use the Kissimmee House until Keith LaMonda is incarcerated and/or Leigh Bradley is disposed of her interest and required to vacate by the Government.

(*Id*. at 2; 50.)  As to recovery efforts, the Agreement further provided:

> **15. Recovery Efforts by the Receiver**. The Receiver believes that there may be additional assets he can recover from third parties. To the extent that the LaMondas assist the Receiver with respect to the efforts, Berna LaMonda will be paid 25% of the net recovery as to each effort in which they assist.

(*Id*. at 8.)  Finally, the Agreement contained a provision stating that failure to perform a party's

obligations would constitute civil contempt:

> **17. Failure to Perform Shall Be Civil Contempt**. Should the LaMondas or any one of them or the Receiver fail to surrender possession of the assets or perform the obligations stated as required herein, they agree that such act shall constitute civil contempt in violation of the Receivership Order and fully understand and agree that the Receiver shall be free to seek civil contempt sanctions against them.

(*Id*. at 9.)

On the day the motion was filed, the Court entered an order (Order) approving the

Agreement.  (*See* doc. 73; 344 at 47-48.)  The Order stated, in relevant part:

> All provisions of the Agreement shall be considered to be Orders of the Court.  Any failure by one or more of the LaMondas or the Receiver to comply with the obligations stated within the Agreement shall constitute civil contempt of this Court to be addressed by further order of the Court after proper motion and chance to be heard.
>     IT IS FURTHER ORDERED that the Court hereby recognizes and decrees the existence of an equitable constructive trust lien in favor of the Receiver against the house

located at 1300 Grandview Boulevard in Kissimmee, Florida in the amount of $1,425,000.00. Said lien is deemed to have arisen and exist in favor of the Receiver as of July 21, 2005.

(*Id.* at 1-2.)

**B.    Initial Civil Action**

On June 14, 2010, LaMonda filed a declaratory judgment action in this district against the SEC and the Receiver, alleging breach of the Agreement and violation of the Order. *See* Civil Action No. 3:10-CV-1190-P (N.D. Tex.). He sought a declaratory judgment that the Receiver had exceeded the authority provided in the Order by foreclosing upon the equitable constructive trust lien; that the Receiver violated the Order by failing to pay the expenses of the property; that the Receiver's agreement with the U.S. Government regarding the disposition of the property was contrary to the authority conferred on the Receiver by the Court's orders; and that the Receiver was obligated to pay LaMonda 25% of the net recovery that he recovered with LaMonda's assistance, including but not limited to, $3.2 million that the Receiver has acknowledged collecting. (*See id.* at doc. 1, pp. 14-15.) That action was dismissed on October 26, 2011, based on considerations of judicial administration that favored pursuit of the claims in this receivership proceeding. (*See id.* at docs. 36, 38.)

**C.    Substantive Claims**

On May 2, 2012, LaMonda filed his verified motion to compel the Receiver to comply with the Agreement that has been construed as a contempt motion. (*See* doc. 344.) Although never specifically recited in his motion, it appears from the relief he expressly seeks that LaMonda is reasserting his allegations in the prior civil action, i.e., that the Receiver breached the Agreement and Order by foreclosing upon the equitable constructive trust lien, failing to pay the expenses of

the Property, and failing to pay LaMonda 25% of the net recovery of all assets that the Receiver recovered based on LaMonda's assistance. (*Id.* at 15-16, 30, 33-34, 42-43.) At a hearing on February 20, 2012, LaMonda agreed on the record with the construction of his motion as a contempt motion and with the characterization of his claims of the Receiver's alleged violation of the Order as relating to payment of expenses for the Property, the foreclosure of the Property to enforce the equitable constructive trust lien, and payment of 25% of the net recovery of assets recovered by the Receiver with LaMonda's assistance. He also stated that he was no longer pursuing his claim for the payment of the expenses for the Property.

## II. EVIDENCE

### A. Verified Motion and Exhibits

In support of his verified contempt motion, LaMonda tendered almost 300 pages of exhibits. At the hearing, he offered them into evidence.[2] The motion and exhibits proffer the following relevant, and sometimes conflicting, facts:[3]

### 1. Assistance

ABC-V was a privately held corporation owned and managed by the LaMonda Management Family Limited Partnership (LMFLP). (*Id.* at 22.) LaMonda incorporated ABC-V in 1999 and

---

[2]In his response to the motion, the Receiver objects to several exhibits as unauthenticated hearsay. (*See* doc. 347 at 6.) He reasserted his objection at the hearing. Even if considered, these exhibits do not affect the disposition of the pending motion, so the Receiver's objections are **OVERRULED as moot**. *See Ennis Transp. Co. v. Richter*, No. 3:08-CV-2206-BH, 2011 WL 3702727, at *2 (N.D. Tex. Aug. 22, 2011) (citing *Continental Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-CV-1866-D, 2006 WL 984690, at *1 n. 6 (N.D. Tex. Apr. 4, 2006)).

[3]LaMonda provides a litany of "pertinent background facts" that appear to challenge various motions, court orders, and even the Agreement. (*Id.* at 22-37.) Because he repeatedly concedes that the background facts are not "germane" to the specific issue of the Receiver's compliance with the Agreement, (*see id.* at 29), they are not included. In addition, because he confirmed the scope of the issues on the record at the hearing his allegations are not construed as raising any claim other than the alleged breach of the Agreement.

located it in Houston, Texas, in response to legislation and regulations in Florida concerning viatical settlement provider companies. (*Id*.) He ceased his business in Florida and began new business operations purchasing life settlements only through ABC-V. (*Id.*)

In February 2001, LaMonda entered into a voluntary receivership for a Florida-based block of viatical settlement policies. (*Id.* at 23.)

At the time the SEC instituted this action, LaMonda was facing criminal charges in the State of Florida. (*Id.* at 29.)

Prior to going into receivership, ABC-V purchased numerous bonds from a company called International Fidelity & Surety, Ltd. (IFS). (*Id.* at 65.)

LaMonda and his attorneys had been investigating IFS and working on either a settlement or a lawsuit for many months prior to the Receiver's appointment, and they turned over copies of those files to the SEC and the Receiver. (*Id.* at 80-81.) Between September and November 2006, various emails were exchanged between and among LaMonda, his employees, his attorneys and others regarding payment of bonds by IFS and/or possible litigation against IFS, David Goldenberg (Goldenberg), and Erwin and Johnson LLP (E&J). (*Id.* at 141-50.)

On November 5, 2005, LaMonda sent an email regarding investment opportunities to Ramesh Dusoruth. (*Id.* at 178-79.)

Prior to filing this action, the SEC and LaMonda began engaging in negotiations regarding an agreed order and the receivership; the negotiations continued even after the lawsuit was filed included the Receiver after his appointment. (*Id.* at 191-94, 198-202, 227, 230-37.)

The Receiver communicated "literally dozens or times" with LaMonda's counsel before and after the institution of the receivership proceedings. (*Id.* at 30, 32, 72, 125, 152, 155.) By agreeing

to the receivership, LaMonda gave the Receiver "the 'keys to ABC-V['s]' office and complete files" as well as complete access to his employees and his attorneys. (*Id.* at 30, 36, 72-73, 80.) His attorneys exchanged emails with the Receiver regarding LaMonda's and his employees' cooperation with the Receiver. (*Id.* at 125-28, 273.) LaMonda contends that this assistance was "the beginning, the 'roots', of all the Receiver's knowledge of ABC-V," and that all recoveries stem from this information. (*Id*. at 30.) He believes the Receiver used much of the information supplied by him and his attorneys and employees, although he does not identify any specific information that was used. (*Id.* at 79-80.)

After his appointment on November 17, 2006, the Receiver seized the assets of ABC-V as well as those of the relief defendants, which were all privately held corporations or trusts formed by LaMonda. (*Id.* at 23-25.) The Receiver hired two of LaMonda's employees for a couple of weeks to assist him in relocating the documents from ABC-V's offices in Houston to the Receiver's offices to Dallas. (*Id.* at 103-104.)

After his appointment, the Receiver obtained records showing that IFS was run by two individuals, Goldenberg and Mark Wolok. (*Id.* at 65.) The Receiver filed suit against IFS and the two individuals. (*Id*.) During the litigation, Goldenberg committed suicide. (*Id.* at 66.) The Receiver avers that he and his professionals were solely responsible for investigating and gathering evidence against IFS, without asking for or receiving LaMonda's assistance. (*Id.*) This included the discovery of a life insurance policy for Goldenberg payable to one of his companies. (*Id.*) After negotiations with the family, the Receiver recovered the full amount, $3,127,412.48, for the receivership (Goldenberg settlement). (*Id.*)

In February 2007, LaMonda exchanged emails with his attorneys regarding offers of

assistance to the Receiver, including with collecting outstanding debts and IFS bonds. (*Id.* at 152-53, 295.) He wanted to be sure to build a record of cooperation in case he had "to go to war." (*Id.* at 154.)

In March 2007, LaMonda began negotiations with the SEC. (*Id.* at 203-06.) He later also began negotiations with the Receiver. (*Id.* at 207-20, 222-25.) The parties ultimately reached an agreement that was approved by the Court. (*Id.* at 221.)

LaMonda personally met with the Receiver four times on two dates prior to December 5, 2007, although the meetings were not "substantial": 1) in late July or early August 2007 to accept delivery of the vehicles listed in the Agreement; 2) later that day to do a "walk thru" of the Property; 3) during LaMonda's sentencing hearing on September 18, 2007; and 4) after the sentencing hearing. (*Id.* at 32, 71, 104.)

On September 18, 2007, the Receiver testified at LaMonda's sentencing in *United States v. LaMonda*, 6:05-CR-131-ORL-28JGG (M.D. Fla.). (*Id.* at 30, 86.) He described ABC-V's investment program for life settlement policies, its involvement with IFS, LaMonda's role and involvement with ABC-V and other companies, and his own role as the appointed receiver for ABC-V. (*Id.* at 87-106.) He also testified regarding his negotiations with the prosecutor regarding assets that would be seized in connection with the criminal case and those that would be part of the receivership estate. (*Id.* at 103.)

In October and November 2007, LaMonda corresponded with his attorneys about setting up a meeting with the Receiver and seeking to "enforce and collect" on the Agreement. (*Id.* at 111-23, 164-168.) In emails, LaMonda expressed his concern that the Receiver would not comply with the Agreement, including paragraph 15, and he made reference to "millions and millions that can be

8

collected." (*Id.* at 112-14, 164-66.)  He quoted the language of paragraph 15 and added, "I do not see any requirement that prior approval is required or any other limiting clauses such as assets unknown to the receiver.  I know that maybe [sic] an assumption in some people's mind, but it is not in the agreement.  Your thoughts?" (*Id.* at 114, 166.)  Later in the email, he characterized the payments as "finder fees." (*Id.*)  He also listed items he thought should be collected, including amounts from IFS and E&J. (*Id.* at 114-15, 118-23, 166-68.)  LaMonda concluded by stating that if the Receiver did "not want to play," he might "work with E & J, Kaplan and fight the good fight" against the receivership. (*Id.* at 115, 168.)

On November 27, 2007, LaMonda sent the Receiver an email stating that he wanted to meet to discuss over a dozen collectibles related to LMFLP that he had identified and that were worth millions. (*Id.* at 36, 109, 129-30.)

On November 28, 2007, the Receiver filed a report listing three recoveries for the receivership estate. (*Id.* at 36, 159-162; *see also* doc. 328.)  These include $3,127,412.48 recovered from IFS through the Goldenberg settlement; $2,250,000.00 recovered from E&J; and $1,307,780.00 recovered from DHM Stallard (DHM). (*Id.* at 36.)

LaMonda avers that he assisted with the three recoveries and others, although he does not specify what those other recoveries are. (*Id.* at 36.)

The Receiver met with LaMonda and his attorneys on December 5, 2007 – nine months after filing suit against IFS and several weeks after Goldenberg's death. (*Id.* at 66.)  At that meeting, he told LaMonda that there was no assistance he could provide in connection with the IFS lawsuit or the settlement with Goldenberg's family, and that nothing would be paid to him under the Agreement. (*Id.*)

On December 12, 2007, LaMonda again sent an email to the Receiver's counsel regarding "identifying additional collectable's [sic] for the estate." (*Id.* at 36, 131-39, 156.) The list included E & J, and LaMonda stated that he had lots of information about it, although he acknowledged that the Receiver had been working hard on the case and already had pending litigation. (*Id* at 136.) He contended that he had been of assistance and that he felt that E & J had not done anything wrong. (*Id*.) He also made suggestions for a settlement. (*Id*.) He also forwarded an email to Receiver regarding a loan that had been assigned to the Receiver. (*Id.* at 310.)

On September 19, 2008, LaMonda sent a letter to Joe Lucent regarding the sale of ABC-V's portfolio to Silver Point and instructed him to try to find buyers. (*Id.* at 177.)

LaMonda avers that he assisted the Receiver in selling ABC-V's portfolio, and that it was sold to one of LaMonda's clients, Ramesh Dusoruth. (*Id.* at 36-37.)

### 2. *Property*

In an email dated July 26, 2007, one of LaMonda's attorneys specifically pointed out to him that the Receiver was not required to pay Property expenses under the Agreement. (*Id.* at 225.) In an email on the next day, July 27, 2007, LaMonda discussed prior negotiations regarding the Property that had allegedly been stymied by the prosecutor in the Florida criminal case. (*Id.* at 225-26.) He also asked for an opinion regarding whether the government could force his wife out of the Property. (*Id.* at 226.)

In emails to his attorneys in November 2007, LaMonda expressed his concern that the Receiver would not comply with the Agreement, including paragraph 1, relating to the Property. (*Id.* at 113, 165.) He questioned whether the government would be able to require his wife to vacate the Property. (*Id.*)

On November 21, 2007, at LaMonda's request, his attorneys requested reimbursement for mortgage payments LaMonda made on the Property.  (*Id.* at 174-75.)

Apart from the equitable lien on the Property imposed by the Order, the Property was already subject to three mortgages and a restitution lien in favor of the U.S. government stemming from LaMonda's criminal prosecution in Florida.  (*Id.* at 65.)  The Receiver worked out an agreement with the other lien holders whereby he would maintain the Property, sell it, pay off the mortgages, and split the proceeds with the U.S. government.  (*Id.*)

Because LaMonda refused to sign the deed unless the Receiver paid him 25% of the settlement with IFS (Goldenberg), the Receiver instituted foreclosure proceedings.  (*Id.* at 65.)  He obtained a foreclosure judgment that was upheld throughout LaMonda's appeals, including up to the Florida Supreme Court.  (*Id.* at 65, 34.)  LaMonda disputes that he refused to sign the deed, and he claims that he offered the Receiver the Property in return for "honor[ing]" the Agreement.  (*Id.* at 34, 77.)

The Property has been sold, and its mortgages have been paid.  (*Id.* at 65.)

**B.      Hearing**

On February 20, 2012, an evidentiary hearing was conducted.  All parties appeared in person or through counsel.  The following relevant testimony and evidence was introduced.

*1.      The Receiver*[4]

After the Receiver was appointed on November 17, 2006, he seized the original files of ABC-V from LaMonda's staff and attorneys pursuant to the order of appointment, which gave him the authority to take the records and assets of the receivership.  (*See* Exh. 4.)  He did receive an

---

[4]The Receiver's exhibits, Nos. 1-56 (with the exception of 24 and 28) were admitted at the conclusion of his testimony.

email from LaMonda's attorneys stating that they would coordinate activities with him and try provide him with any information he needed. (*See* doc. 344 at 125.) The Receiver specifically denied that LaMonda assisted him by voluntarily giving him records or millions of dollars of assets; he already had control and possession of those records and assets by virtue of the Court's order appointing him as receiver. (*See* Exh. 4.)

Prior to the SEC's complaint, the Receiver was aware of the claims against IFS and Goldenberg, E & J, Albatross and the bonding companies. (*See* Exh. 2-3.) The SEC's complaint made various allegations concerning IFS, E & J and the bonds. (*See* Exh. 1.) He knew that IFS was a sham, and he suspected that Albatross was as well.

In November 2006, the Receiver and the SEC Examiner (Examiner) went to California and to meet with Chris Erwin (Erwin) of E & J. They relieved him of his duties as trustee and requested that he turn over all funds and records for ABC-V and stand down from any further investigation of IFS. (*See* Exh. 6.) At that time, E & J had only formulated demand letters on the bonds to IFS. The Receiver and Examiner began investigating IFS, and he filed suit against IFS, Goldenberg and Wolok in March of 2007. (*See* Exh. 8-9.) In support of the suit, he filed a declaration setting forth all the facts that he and his staff had gathered up to that point, none of which came from any other source. (*See* Exh. 10.) On May 4 2007, the Receiver obtained a sworn financial statement from Goldenberg that disclosed a $3 million life insurance policy. (*See* Exh. 12.) The investigation continued, and the Examiner's counsel prepared a memorandum regarding his efforts to pursue the claims against IFS on May 22, 2007. (*See* Exh. 13.) Two days later, an order of final default judgment was entered against IFS. (*See* Exh. 14.) Prior to the Agreement, the Receiver entered into an agreement to receive the proceeds of that insurance policy.

The Receiver began working with criminal authorities in California regarding aspects of Goldenberg's business with no involvement by LaMonda or his attorneys. Goldenberg committed suicide after he was indicted there for his involvement with IFS. (*See* Exh. 22.) The Receiver ultimately entered into an agreement with Goldenberg's widow and the surety marketing source that owned the policy whereby the receivership would receive the proceeds from Goldenberg's life insurance policy and the judgment against his estate and the surety marketing source would be limited to that amount. The Court approved the settlement. (*See* Exh. 31-32.) No assistance was provided by LaMonda with regard to this settlement.

With regard to E & J, the Examiner prepared a preliminary analysis of potential claims against E & J in December 2006. (*See* Exh. 7) LaMonda's position from day one was that Erwin was a fine lawyer and had done nothing wrong. On June 14, 2007, the Receiver sent a demand letter to E & J seeking repayment of monies paid to Erwin, including a $500,000.00 retainer paid by LaMonda after he was no longer the trustee. (*See* Exh. 15.) The Receiver filed suit against E & J on June 27, 2007. (*See* Exh. 17-18.) E & J's counsel stated that it intended to spend every nickel of its insurance policy fighting the lawsuit. Eventually, the lawsuit settled as a result of a two-day mediation several years later. The Court approved the settlement. (*See* Exh. 46-47.) LaMonda provided no assistance with the E & J settlement.

As to Albatross, the Examiner agreed to head the investigation. He hired counsel in London and Italy to assist and gather evidence for a case against it. On June 21, 2007, he prepared a memorandum to the file regarding the Albatross bonds. (*See* Exh. 16.) On September 25, 2007, the Examiner and one of the Receiver's attorneys went to London to meet with their overseas counsel to discuss the claims against Albatross and DMH. The attorneys determined that Albatross was not

a source of recovery and that the real cause of action would be against DMH for their role in failing to do their due diligence. (*See also* doc. 48.) The Examiner prepared a memorandum about the meeting and the investigation of DMH on September 25, 2007. (*See* Exh. 23.) The Receiver was able to obtain a settlement with DMH through litigation in the United Kingdom, and the settlement was approved by the Court. (*See* docs. 43-45.) LaMonda did not assist with this recovery.

The Receiver testified that the Agreement was the only written agreement between the parties. The parties engaged in negotiations prior to the execution of the Agreement and exchanged other drafts of the Agreement. Those prior drafts underwent changes requested by Receiver, the SEC, LaMonda's counsel, his wife's counsel, and the government authorities in Florida. The Receiver is the primary of author of the Agreement, but it was "scrubbed" by eight sets of attorneys. He is the one that took it to the Court for approval. The Agreement was not executed at the time it was attached to the motion he filed with the Court seeking approval. After the Court granted the motion and approved the Agreement on July 12, 2007, the Receiver gathered signatures. The Agreement attached to the motion is the document that the parties signed. (*See* Exh. 19-20.)

In November 2007, LaMonda sent the Receiver an email about "additional" collectibles. (*See* doc. 344 at 109, 129-30.) This was the Receiver's first direct communication from LaMonda. The email did not mention IFS, E & J, or DMH. The Receiver had no substantive conversations or meetings with LaMonda until December 5, 2007. Prior to that, he had spoken generally with him when he picked up the vehicles listed in the Agreement, walked through the Property, and at LaMonda's sentencing. The first time that the Receiver talked with LaMonda about documents and information that the Receiver did not already have in his possession was December 5, 2007, after the criminal proceedings in Florida had concluded and prior to LaMonda's incarceration. Prior to

that, he had not had any substantive conversations with LaMonda per LaMonda's attorneys' instructions because LaMonda was facing a criminal trial.

The December 5, 2007 meeting lasted for 3 days, and various people attended it at different times. The purpose of the meeting was for LaMonda to tell the Receiver about additional collectibles he thought the Receiver could recover with his assistance. At that meeting, they talked about the Property and the payment of expenses, and they worked out a protocol to deal with that. They spent a good deal of time on that subject.

The parties also discussed the IFS litigation. The Receiver explained that he already had a judgment against it and the means to satisfy it through the pursuit of an insurance policy and other assets. There was nothing that LaMonda could add to the information already known to the Receiver, and some of the information he provided contradicted the information the Receiver had. At that time, LaMonda and his lawyers still thought that IFS was legitimate, and that a claim could be made against the company. The Receiver knew that the bonding company's address was a post office address, that the accounting firms that allegedly audited their financials did not exist, that documents were forged, and nothing was legitimate. This was a shock to LaMonda. The Receiver specifically told LaMonda at the meeting that the Goldenberg proceeds were not subject to paragraph 15 of the Agreement. The Receiver would not have set the meeting if he had known that LaMonda wanted to talk about IFS because the Receiver already had everything he needed at that point.

At the meeting, Lamonda's position continued to be that Erwin did nothing wrong and that E & J was a dry hole that the Receiver should not be pursuing. He did say he thought he could get a settlement if the Receiver let him work on it, but the Receiver did not accept his offer. The

Receiver specifically told LaMonda that he would not share in the settlement with E & J. He also told LaMonda that the DMH settlement would not be subject to paragraph 15 of Agreement. The Receiver did share a report he received from Italian counsel regarding the criminal history of an officer of Albatross. (*See* doc. 25.) The Receiver's and Examiner's representatives took notes of the December 5, 2007 meeting. (*See* docs. 26-27.)

In October 2008, the Receiver sold ABC-V's portfolio through a Court-supervised public auction to the highest bidder. (*See* doc. 39.) He was unaware that LaMonda contacted any potential bidders.

The Receiver emphatically denied that LaMonda assisted him with any of the actual recoveries or sale of the portfolio. He made multiple collections on behalf of the receivership estate, and all were reported to and approved by the Court. He sold vehicles and houses, obtained settlements with certain parties, and ultimately sold the portfolio of insurance policies. None of the items the Receiver collected related to paragraph 15 of the Agreement.

The Receiver and his staff did everything they could to track down information regarding all of the additional collectibles that LaMonda brought to the table in December 2007. They tried to reach out to him when they got to a dead end with no results. Ultimately, nothing was recovered from those additional collectibles identified by LaMonda.

After his incarceration, LaMonda started sending the Receiver letters alleging breach of the Agreement. (*See* docs. 40-41.) On July 15, 2009, the Receiver sent LaMonda a letter with supporting documentation that refuted all of LaMonda's allegations. (*See* Exh. 42.) The Receiver had previously communicated 99% of that same information to LaMonda's attorneys. The letter specifically addressed LaMonda's claims regarding paragraph 15 of the Agreement.

The Receiver acknowledged that the Agreement does not specifically state that the Receiver may foreclose on the Property. The Agreement does state that the Property was impressed with an equitable constructive trust lien in the amount of $1,425,000.00. This was the amount of money spent on repairs to the Property that were traceable "beyond question" to funds originating in investor hands. The Receiver was required to file a foreclosure action. (*See* docs. 51-54.) LaMonda's wife voluntarily vacated the Property to avoid the process of being required to vacate by the government. The Receiver is certain that if he had not reached an agreement with the government, it would have required her to vacate the Property. The sale of the Property was approved by the Court. (*See* docs. 55-56.)

2. *Gary LaMonda*

Gary LaMonda is LaMonda's brother. He paid an expert to extract emails from an archived file on LaMonda's laptop computer. He printed them and sent them to LaMonda, and they are attached to LaMonda's contempt motion.

3. *Bill Whitehill*

Bill Whitehill was LaMonda's attorney for a number of years and was part of the team that negotiated the Agreement. The emails attached to the contempt motion are the type of emails that he received from LaMonda. LaMonda offered the Receiver his assistance and information. Mr. Whitehill and co-counsel were in contact and met with the SEC before the receivership, and they provided it with information. LaMonda instructed counsel to give them everything they wanted. Another attorney advised LaMonda not to be so forthcoming. LaMonda offered to share the information that he had.

*4.      LaMonda*

LaMonda testified that all of his affidavits and statements in his motion were true.  He gave the Receiver every bit of assistance that he could, including access to his personal files.  His attorneys told him that he could not meet with the Receiver because of the pending criminal charges, so he instructed his employees and attorneys to provide any assistance requested.  All of the emails attached to his contempt motion came from his computer and are his business records.  Finally, he testified that ABC-V was not a Ponzi scheme, and that he never took purchaser money, only profits.

### III.  MOTION FOR CONTEMPT

"A party may be held in contempt if he violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington*, 832 F.2d 909 (5th Cir. 1987) (*citing Sec. and Exch. Comm'n v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 669 (5th Cir. 1981)).  In order to recommend a finding of contempt in this case, the Court must find that the moving party established by clear and convincing evidence "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). In the contempt context, clear and convincing evidence is "'that weight of proof which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case.'" *Travelhost Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).  "The judicial contempt power is a potent weapon" that should not be used unless a specific aspect of the court' order has been "clearly violated." *Piggly Wiggly Clarksville, Inc. v.*

*Mrs. Baird's*, 177 F.3d 380, 383 (5th Cir. 1999).

## A.    Property

As to the expenses of the Property, the Agreement expressly states that as long as the Receiver, "in his discretion, deems it proper, he shall pay all expenses relating" to the Property. (*See* doc. 71-2 at 2; doc. 344 at 50.)  Payment of the expenses by the Receiver was discretionary, not mandatory.  LaMonda's supporting evidence reflects that this fact was specifically pointed out to him by his counsel.  (*See* doc. 344 at 225.)  LaMonda has now abandoned this claim.

As for the foreclosure, LaMonda has not shown by clear and convincing evidence that the Agreement required the Receiver to refrain from foreclosure and sale of the Property to enforce the equitable constructive trust lien in favor of the Receiver in the amount of $1,425,000.00.  In addition to the language of the Agreement, the Court's Order separately recognized and decreed the existence of that lien.  The Agreement specifically recognized that LaMonda's wife could be required to vacate the Property by the government.  Pursuant to the agreement negotiated by the Receiver, she voluntarily vacated the Property to avoid that process.  The sale of the Property was later approved by the Court.

LaMonda has not shown by clear and convincing evidence that the Receiver "clearly violated" the Agreement or the Court's Order by not paying the expenses of the Property or by foreclosing on it and selling it to enforce the receivership's equitable lien.

## B.    Assistance

LaMonda contends that the Receiver was required to pay him 25% of any recoveries in which he assisted, including the recoveries against IFS and/or Goldenberg, E & J and DMH.  It is undisputed that LaMonda provided the SEC and the Receiver access to his attorneys, employees,

and records, and that he offered information and assistance. What is in dispute is whether this constitutes the type of assistance contemplated by paragraph 15 for which payment was required to be made.

The Agreement specifically states:

The Receiver believes that there may be additional assets he can recover from third parties. To the extent that the LaMondas assist the Receiver with respect to the efforts, Berna LaMonda will be paid 25% of the net recovery as to each effort in which they assist.

(*See* doc. 71-2 at 8.)

LaMonda's contention that he assisted the Receiver appears to be primarily premised on his agreement to the seizure of ABC-V's records and assets, the Receiver's employment of two of LaMonda's employees to assist with the transfer of records, and his offer of any assistance needed and information through his attorneys. While LaMonda appears to sincerely believe that his cooperation in the seizure of ABC-V's records and assets constituted assistance to the Receiver, the order appointing the Receiver required seizure of all assets and records of the receivership regardless of LaMonda's agreement or cooperation. LaMonda has not shown that this is the type of assistance contemplated by the Agreement. Other than to generally cite his records and files, he has not identified any specific information that he provided to the Receiver that assisted him with the recoveries that were actually made.

The Court also finds the testimony of the Receiver that LaMonda provided no assistance with any recoveries to be more credible than LaMonda's. The Receiver's testimony is supported by the record, including the timing of the events that ultimately led to the recoveries against IFS and/or Goldenberg, E & J, and DMH, or with the sale of the portfolio. These events preceded both the Agreement and the Receiver's first substantive meeting with LaMonda in December 2007. At that

meeting, LaMonda provided no information that assisted the Receiver, and he provided information that contradicted facts known to the Receiver. At that meeting, LaMonda continued to assert that E & J had done nothing wrong, and that the Receiver should pursue IFS and Albatross for payment on the bonds although the Receiver had determined that they were sham entities. The Receiver pursued the information about additional assets provided by LaMonda at the meeting, but he was unable to generate any additional recoveries. Finally, the sale of the portfolio was completed as the result of a Court-supervised public auction. LaMonda did not broker the sale. The fact that he may have assisted the ultimate buyers start their companies prior to the SEC's proceedings does not equate assistance with the sale. LaMonda has not established by clear and convincing evidence that he, or anyone else on his behalf, actually assisted the Receiver with the recovery of any assets.

Even assuming *arguendo* that LaMonda provided assistance by virtue of allowing access to his staff and records, or even through any information he provided at December 2007 meeting, he has still not shown that this was the type of assistance contemplated by the Agreement. The first sentence and the preceding four paragraphs provide context for the type of efforts (or assistance) for which payment was required to be made under the second sentence of paragraph 15. Paragraphs 10-14 provided that all assets of ABC-V and three other entities related to LaMonda were deemed to be assets of the receivership subject to the Receiver's control. (*Id.* at 7.) The evidence is clear that by the time the Agreement was presented to the Court, the Receiver had already sued IFS and Goldenberg and had obtained a default judgment IFS. The Receiver had already made demand upon and sued E & J, and he was well into the process of pursuing DMH. Because these actions were already assets of the receivership, they could not be "additional assets" as contemplated by the Agreement. LaMonda's own November 27, 2007 email referred to "additional" collectibles and did

not mention any of these entities; this is consistent with a reading of the entirety of paragraph 15 in the context of the Agreement." He had also previously characterized payments under the agreement as "finder fees." (doc. 344 at 114, 166.)

When having the Receiver read paragraph 15 into the record, LaMonda glossed over the first sentence and focused only on the second sentence. Throughout the remainder of his examination of witnesses, his testimony, and all of his voluminous filings, he carefully avoided any use of the term "additional assets" as used in the first sentence. LaMonda provides no other possible explanation for the inclusion of the first sentence in paragraph 15; he just ignores it. His interpretation of paragraph 15 renders the first sentence superfluous. LaMonda has not met his burden to show by clear and convincing evidence that the Order required the Receiver to pay him 25% of all of the recoveries against IFS and/or Goldenberg, E & J, and DMH, or with the sale of the portfolio. Nor has he shown that the Receiver violated the Order by failing to do so.

In conclusion, LaMonda's motion for an order to show cause why the Receiver should not be held in contempt for failing to comply with the Order should be denied.

## IV. MOTION TO FREEZE ASSETS

LaMonda seeks an order freezing the assets of the receivership pending determination of his contempt motion under the All Writs Act, 28 U.S.C. § 1651(a). (*See* doc. 356.) He contends that allowing the Receiver to terminate and liquidate the receivership estate will frustrate his ability to obtain relief from the estate and cause him "irreparable harm." (*Id.* at 3-4.) Despite his initial reliance on the All Writs Act, his reply concedes that the Receiver correctly characterizes his motion

as a request for a preliminary injunction. (*See* doc. 368 at 6.)[5]

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 376 (2008). To obtain a preliminary injunction, the movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) (citing *Winter*, 129 S.Ct. at 374). The party seeking the preliminary injunction bears the burden of persuasion on all four requirements. *Bluefield Water Assoc., Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). If the movant fails to carry the "heavy burden" to show each of the four prerequisites, a preliminary injunction is not warranted. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

Here, because LaMonda has not shown that the Receiver should be held in contempt for violating the Order, he cannot establish the likelihood of success on the merits of his claim. Nor has he shown irreparable harm, that the equities tip in his favor, or that the public interest will be served. His motion for a preliminary injunction should be denied.

## V. MOTION FOR SANCTIONS

LaMonda seeks sanctions against the Receiver under Fed. R. Civ. P. 11 for allegedly characterizing ABC-V as a Ponzi scheme in his objection and response to the contempt motion as well as in other unspecified filings. (*See* doc. 366 at 2, 6.) He argues that although the SEC initially

---

[5]The All Writs Act provides "power [to] a federal court to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159 (1977); *see also* 28 U.S.C. § 1651(a).

alleged the existence of a Ponzi scheme, the defendants denied the allegations, and the matter was resolved through the Agreement without any admission of a Ponzi scheme. (*Id.* at 2-3.) Because the Receiver is aware that no Ponzi scheme was ever established, LaMonda contends, he has made a representation in a court filing without evidentiary support in violation of Rule 11(b). (*Id.* at 4-6.)[6]

Rule 11(b) provides that by presenting a filing to a court, attorneys and *pro se* litigants are certifying that to the best of their belief, after reasonable inquiry, (1) the filing is not being presented for an improper purpose, such as harassment, delay, or increasing costs; (2) any claims and/or defenses in the filing are supported by either existing law or by a nonfrivolous argument for changing existing law or establishing new law; and (3) factual contentions have or will likely have evidentiary support. The purpose of the rule is to "deter baseless filings in district court", *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and "to spare innocent parties and overburdened courts from the filing of frivolous lawsuits", *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir. 1987). After notice and opportunity to respond, courts finding a Rule 11(b) violation may impose appropriate sanctions. Fed. R. Civ. P. 11(c)(1). These may include monetary and injunctive sanctions, *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359-60 (5th Cir. 1986), and even dismissal, *see Jimenez v. Madison Area Technical Coll.*, 321 F.3d 652, 657 (7th Cir. 2003). Courts have a duty to impose the least severe sanction that is sufficient to deter future conduct. *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993); Fed. R. Civ. P. 11(c)(4). The moving party has the burden to

---

[6]In response to the motion for sanctions, the Receiver initially argues that LaMonda lacks standing to seek sanctions because he had been terminated as a party. (*See* doc. 369 at 3-4.) The Order expressly provides that any failure by a party to the Agreement to comply with its obligations "shall constitute civil contempt of this Court to be addressed by further order of the Court after proper motion and chance to be heard." (*See* doc. 73; 344 at 47-48.) Because the Order specifically permits LaMonda to pursue his contempt motion, and LaMonda's motion for sanctions is directed at the Receiver's response to the contempt motion, the Receiver has not shown that LaMonda lacks standing to file his sanctions motion. *See Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992) (a Rule 11 motion for sanctions is "collateral to the merits" of the case).

overcome the presumption that pleadings are filed in good faith. *Tompkins v. Cyr,* 202 F.3d 770, 788 (5th Cir.2000).

Here, LaMonda complains of the following statement in the Receiver's response to the contempt motion:

> The Commission alleged that Defendant C. Keith LaMonda ("LaMonda") used ABC to run a Ponzi scheme that raised at least $100 million from over 4,100 investors worldwide. (Compl. [Doc. 1] at 1.) LaMonda is currently serving a five-year prison sentence for running a related scheme in Florida.

(*See* doc. 347 at 2.) The statement regarding the SEC's allegations is a characterization of the SEC's claims as set forth in the complaint; it is not an allegation by the Receiver that ABC-V was a Ponzi scheme. As for the second sentence, LaMonda's evidence in support of his contempt motion showed that he entered into a voluntary receivership for a Florida-based block of viatical settlement policies like those involved in this case, and that he was facing criminal charges in the State of Florida relating to those policies. (*See* doc. 344 at 23, 29.) Even considering any inference that ABC-V was a Ponzi scheme from the two statements in the response at issue, neither rises to the level of sanctionable conduct under Rule 11(b). *Compare Gardner v. Waterman Steamship Corp.*, 2002 WL 31115252 (E.D. La. Sept. 23, 2002) (statement in motion that was directly contradicted by attached sworn deposition "border[ed] on the sanctionable"). LaMonda has not met his burden to overcome the presumption of good faith, and the motion for sanctions should be denied.

## VI. MOTION TO INTERVENE

In response to the Receiver's contention in his response to the motion for sanctions that LaMonda lacked standing to seek sanctions because he had been terminated as a party (*see* doc. 369 at 3-4), LaMonda moves to intervene in this action (*see* doc. 374). The Court has found that LaMonda has standing to file his sanctions motion because the Order permits LaMonda to file his

contempt motion, and the motion for sanctions was directed at statements in the Receiver's response to the contempt motion. LaMonda is a party to the contempt motion and related motion, so formal intervention is therefore unnecessary. The motion to intervene should be denied.

## VII. RECOMMENDATION

LaMonda's motions for an order to show cause why the Receiver should not be held in contempt, to freeze the receivership's assets, for sanctions against the Receiver, and to intervene, should be **DENIED**.

**SO RECOMMENDED on this 22nd day of February, 2013.**


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE